UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x
In Re:                                      :    Bankruptcy Case
                                            :    No. 07-22753 (ASH)
STEPHEN M. ROBINS,                          :
                                            :
                                            :
            Debtor.                         :
                                            :
—————————————————————— :
TRIBECA LENDING CORP.,                      :    Civil Case
                                            :    No. 7:09 Civ. 3566 (CS)
            Plaintiff/Appellee,             :
                                            :
                                            :
      - against –                           :
                                            :
STEPHEN M. ROBINS,                          :
                                            :
            Defendant/Appellant.            :
                                            :
—————————————————————— x

### APPELLANT'S REPLY
### MEMORANDUM OF LAW

THEODORE GEWERTZ (TG 2428)
51 West 52nd Street
New York, NY  10019
(212) 403-1000
E-mail tgewertz@wlrk.com
*Special Litigation Counsel pro bono*

ALTER, GOLDMAN & BRESCIA, LLP
Bruce R. Alter (0457)
550 Mamaroneck Avenue
Harrison, New York  10528
(914) 670-0030
E-mail altergold@aol.com

*Co-Attorneys for Defendant/Appellant
Stephen M. Robins*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT................................................................................................1

STATEMENT OF FACTS AND PRIOR PROCEEDINGS.................................................1

The Tribeca mortgage loans to Defendant .........................................................................1

The sale of Defendant's residence and disposition of the proceeds....................................4

Events preceding defendant's August 4, 2008 determination not to continue the litigation ..............6

The events subsequent to the August 4 letter .....................................................................8

ARGUMENT .......................................................................................................................11

    I.      LEGAL STANDARDS APPLICABLE TO THIS APPEAL AND THE MOTIONS BEFORE THE BANKRUPTCY COURT ...............................................11

    II.     THE BANKRUPTCY COURT APPLIED AN ERRONEOUS LEGAL STANDARD WITH RESPECT TO DEFENDANT'S ATTEMPT TO VACATE THE DEFAULT AND MADE CLEARLY ERRONEOUS FACTUAL DETERMINATIONS IN CONCLUDING THAT SUCH DEFAULT WAS WILLFUL AND STRATEGIC......................................................13

    III.    THE BANKRUPTCY COURT ERRED IN CONCLUDING THAT DEFENDANT DID NOT SHOW MERITORIOUS DEFENSES............................15

    A.    Section 523(a)(2)(B) ..........................................................................16

    B.    Section 523(a)(4)...............................................................................17

    C.    Section 523(a)(6)...............................................................................18

    IV.    THE BANKRUPTCY COURT ERRED IN CONCLUDING THAT TRIBECA WOULD BE PREJUDICED BY DENIAL OF A DEFAULT JUDGMENT AND VACATUR OF THE DEFAULT AND THAT DEFENDANT HAD IRREVOCABLY WAIVED AND WAS EQUITABLY ESTOPPED FROM LITIGATING THE MERITS OF THE NON-DISCHARGEABILITY PROCEEDING.................................................................20

    V.     THE BANKRUPTCY COURT ABUSED ITS DISCRETION................................23

CONCLUSION ...................................................................................................................25

# TABLE OF AUTHORITIES

**Page**

**Cases**

Action S.A. v. Marc Rich & Co., 951 F.2d 504 (2d Cir. 1991) ...............................................14, 14 n.*

American Alliance Ins. Co. v. Eagle Ins. Co., 92 F.3d 57 (2d Cir. 1996) ..................................14, 15

Brien v. Kullman Indus., Inc., 71 F.3d 1073 (2d Cir. 1995) ..............................................................14

Citik Ka Wah Bank Ltd. v. Wong, 291 BR. 266 (Bankr. S.D.N.Y. 2003) ..................................20 n.*

Dow Chemical Pacific Ltd. v. Rascator Maritime S.A., 782 F.2d 329 (2d Cir. 1986) ....................12

Gaglio v. Silverman, 330 B.R. 40 (Bankr. S.D.N.Y. 2005) ........................................................14 n.*

Hernandez v. La Cazuela de Mari Rest., Inc., 538 F. Supp. 2d 528 (E.D.N.Y. 2007) ...............14 n.*

Heymann v. Brechner, 1996 U.S. Dist. LEXIS 14936 (S.D.N.Y. 1996) ............................15, 15 n.**

In re CBI Holding Co., Inc., 529 F.3d 432 (2d Cir. 2008) ................................................................17

In re Frank Santora Equipment Corp., 256 B.R. 354 (Bankr. E.D.N.Y. 2000)................................22

In re Men's Sportswear, Inc., 834 F.2d 1134 (2d Cir. 1987) ............................................................14

In re Texaco Inc., 254 B.R. 536 (Bankr. S.D.N.Y. 2000)................................................................23

Navistar Financial Corp. v. Stelluti, 94 F.3d 84 (2d Cir. 1996)............................................19, 20 n.*

Richardson Greenshields Securities, Inc. v. Int'l Petroleum Corp., 1988 U.S. Dist. Lexis
    20974 (S.D.N.Y. 1988) ............................................................................................................12

United States v. Erdoss, 440 F.2d 1221 (2d Cir. 1971)...............................................................15 n.*

Wagstaff-El v. Carlton Press Co., 913 F.2d 56 (2d Cir. 1990) ...............................................14, 15 n.*

**Bankruptcy Code**

11 U.S.C. § 523(a)....................................................................................................................................1

11 U.S.C. § 523(a)(2)(B)...........................................................................................................2, 3, 4, 16, 17

11 U.S.C. § 523(a)(4) ......................................................................................................................17, 18

11 U.S.C. § 523(a)(6) ............................................................................................................18, 19, 20 n.*

11 U.S.C. § 544(a)................................................................................................................................18

## Statutes and Rules

Bankruptcy Rule 8010(a)(1)(D) ..................................................................................1

Bankruptcy Rule 8010(a)(2) .......................................................................................1

Fed. R. Civ. P. 55(b)...........................................................................................11, 12

Fed. R. Civ. P. 55(b)(1) ..........................................................................................7, 8

Fed. R. Civ. P. 55(b)(2) ...............................................................................11, 9 n.*

Fed. R. Civ. P. 55(c)...........................................................................11, 12, 14, 9 n.*

Fed. R. Civ. P. 60(b)......................................................................12, 14, 15, 15 n.*

N.Y. Penal Law § 185.10 ...........................................................................................5

New York Real Property Law § 291 .........................................................................18

## Other Authorities

5 Collier on Bankruptcy ¶ 544.02 (15th ed. rev. 2009)................................................18

## PRELIMINARY STATEMENT

This memorandum is submitted on behalf of Defendant/Appellant Stephen M. Robins ("Defendant") in reply to the "Brief of Appellee Tribeca Lending Corp.," dated June 22, 2009 (hereafter "Tribeca Brief") and in further support of Defendant's appeal from orders of the bankruptcy court resulting, upon reargument, in the grant of a default judgment against Defendant, a bankrupt, declaring that his approximately $1.7 million unsecured debt to Plaintiff/Appellee Tribeca Lending Corp. ("Tribeca"), based upon an unrecorded mortgage loan, was a nondischargeable debt under section 523(a) of the Bankruptcy Code.*

As will be shown below, the Tribeca Brief is long on self-serving rhetoric seeking to demonize Defendant, but woefully short on any effective response to the detailed demonstration in Defendant's Brief that the determinations of the bankruptcy court appealed from herein amounted to abuses of its discretion, since they were based upon erroneous views or applications of the law and/or on clearly erroneous assessments of the record.

## STATEMENT OF FACTS AND PRIOR PROCEEDINGS

In this section, Defendant will respond to the various misstatements, mischaracterizations and misleading argumentative material contained in the section of the Tribeca Brief supposedly devoted to the presentation of facts "relevant to the issues presented for review" on this appeal.  See Bankruptcy Rule 8010(a)(1)(D) and (a)(2).

The Tribeca mortgage loans to Defendant

The events in connection with the making of the mortgage loans to Defendant are relevant to the issue of whether Defendant has shown the existence of a meritorious defense to Tribeca's claim that the unsecured debt created by its unrecorded loans to Defendant are not

---

* References to particular pages of the Tribeca Brief are preceded by the prefix "TBR." Defendant's original memorandum, dated May 22, 2009, is referred to as "Defendant's Brief" and citations to pages thereof are preceded by the prefix "DBR."  As in Defendant's Brief, references bearing the prefix "R" are to the numbered pages in the documents in the Record on Appeal.

dischargeable under section 523(a)(2)(B) of the Bankruptcy Code for alleged use of a materially false written statement in obtaining the loans.  See DBR 5-7, 31-34.  Tribeca's version of such events fails to establish that Tribeca could meet the requirements of that section or rebut Defendant's showing (a) that Defendant did not obtain the loans by the use of the written applications claimed by Tribeca, (b) that Tribeca did not and could not have relied, much less reasonably relied, on such applications, (c) that the existence and nature of alleged undisclosed contingent liabilities and other obligations underlying Tribeca's claim were in fact disclosed, both orally and in writing, to Tribeca's agent, who told Defendant that it was not necessary to include them in the application, (d) that accordingly, and for other reasons, such contingent liabilities (much of which were listed as disputed) were not material to Tribeca's decision to lend, and (e) that in not listing such contingent liabilities in detail in the applications, Defendant did not act with the requisite intent to deceive Tribeca.

Tribeca's approach (TBR 3-5) is to point to the Initial Applications* (upon which Tribeca did not lend and as to which Defendant insisted on changing to accurately reflect, inter alia, the existence of contingent liabilities), purport to summarize Defendant's supposed "excuses" for not including such contingent liabilities in the Initial Application and attack such "excuses." However, the reasons for non-inclusion of the contingent, disputed liabilities are not excuses and in any event are mischaracterized by Tribeca at TBR 3.  Tribeca concedes that Tribeca, not Defendant, prepared the Initial Applications.  Id.  It complains, however, that Defendant should have revised the Initial Applications to include the contingent liabilities in detail.  Id. 3-4.  However, Tribeca chooses to ignore Defendant's showing that the revisions he made, which subsequently became part of the Final Applications, as well as Defendant's written and oral communications with Carayol, Tribeca's agent for making the loan, disclosed to Tribeca that, among other things, Defendant was a party to a lawsuit, that he was in default on federal debts and other loans or financial obligations and

---

* See Defendant's Brief at 5-6 for a description and definition of the terms "Initial Applications" and "Final Applications."

that he was a co-maker or endorser on a note.  See DBR 6-7.  Tribeca also chooses to ignore the proof that Carayol told Defendant that these changes "would take care of it."  Id. 7; R. 131-32.

Tribeca also concedes that Carayol instructed Defendant that, for Tribeca's purposes, only liabilities that appeared in Defendant's credit report should appear on the applications, TBR 4, but attempts to escape the consequences of such instruction by incessantly repeating that there is no proof that Carayol or Tribeca knew the extent of the contingent liabilities or that Defendant told Carayol of the specifics.  Id. 4-5.  However, this excuse by Tribeca rings hollow, in view of the admitted fact that Tribeca knew the nature of these contingent liabilities and Defendant had included them in the previously filed schedules in the Rockwells case.[*]

Moreover, Tribeca's instructions to Defendant that only liabilities on his credit report should be included preclude Tribeca from being able to establish the essential elements of a claim under section 523(a)(2)(B) that (a) the alleged financial misstatements were material, (b) that Tribeca reasonably relied on them in extending credit and (c) that Defendant intended to deceive Tribeca into making the loan.  Indeed, Tribeca's own selected excerpts from the communications between its Carayol and Defendant reveal that Tribeca, a subprime lender anxious to make loans to generate huge fees and commissions, including a $34,000 loan origination fee, went ahead with the loan knowing that Defendant had no significant assets other than his residence ("You didn't show me any assets" R. 407; TBR 5), thereby evidencing that fact that Tribeca knew that the only source of repayment was the residence itself and that it was relying primarily on that, and not Defendant's other assets or the alleged absence of liabilities.  And, of course, had Tribeca simply recorded its mortgages, it would have been repaid, thereby eliminating the need for it to conjure up grounds for

_____

[*] Other misstatements abound in the Tribeca Brief on this subject.  Thus, there is no statement in Defendant's Brief in words or substance that "Tribeca didn't ask about my tax liabilities" TBR 4, there is nothing in the record to show that Tribeca's preparation of the applications including the schedule of liabilities was "a convenience and courtesy" to Defendant, id. at 3, and the quotes from Carayol at page 5 of the Tribeca Brief reflecting Carayol's frustrations with Defendant have nothing to do with any alleged understatement of liabilities.

this litigation and what Tribeca knew would be a futile attempt to get Defendant's bankruptcy case dismissed.

Tribeca's Brief also fails to controvert Defendant's showing that Tribeca brought the section 523(a)(2)(B) nondischargeability claim based upon the Initial Applications, which it rejected, and that Tribeca did not lend until it received the Final Applications.  See DBR 5-7, 32-33. Instead, it makes the unresponsive contention that "regardless of which iteration of the loan application one reviews," TBR 4, the absence of a detailed schedule of the subject contingent liabilities from even the Final Applications, no matter what the reason therefor, furnishes it with a viable claim, even though it is not the claim that Tribeca has sued upon.

The sale of Defendant's residence
and disposition of the proceeds

Tribeca does not deny that Defendant notified it of the proposed sale and provided it with copies of the contract, but claims that it did not know of its own failure to record the mortgages until after the closing and implies that Defendant had a duty to inform it of such failure.  TBR 6.  It is irrelevant when Tribeca knew about its own failure to record and there is nothing in the record to support its assertion as to the timing or its additional assertion (id. fn. 2) that the failure to record was due to a mistake by its abstract company.  Recording was for Tribeca's own protection, Defendant had no duty to tell Tribeca of its own failure to record and Tribeca collected $18,765 in mortgage recording fees and taxes from Defendant.  Whether or not it consciously chose to keep that money for itself, Tribeca has only itself to blame for its failure.

Tribeca, without direct quotation, asserts that Defendant's Brief at 8 states that Defendant "turned over all the proceeds to his bankruptcy attorney, except his $50,000.00 homestead exemption" and then asserts that such statement "is simply a lie."  TBR 6.  However, the referenced page in Defendant's Brief does not support Tribeca's assertion.  What it did truthfully say was that Defendant, "upon the advice of counsel," "turned over the checks representing the closing proceeds, to be held in escrow pending the filing of the bankruptcy petition.  Upon such

filing, the net balance, after deduction of Defendant's homestead exemption of $50,000, was then turned over to the Trustee. . . ."  DBR 7-8.[*]

At page 6 of its Brief, Tribeca claims that Defendant's assertion that had he paid Tribeca, the payments would have been recoverable by a trustee as a preferential payment, is either a lie or incorrect as a matter of law.  However, on the very next page Tribeca contradicts itself, by grudgingly admitting that such statement is "[l]ikely true."  TBR 7.

Tribeca next claims that Defendant's assertion that the sale proceeds belong to Defendant and not Tribeca is incorrect as a matter of law and that Defendant's position is grounded on the fact the mortgages were unrecorded.  Tribeca misrepresents Defendant's legal position, which is not, as claimed by Tribeca, dependent upon whether or not the mortgages were recorded. See DBR 37.  See also R. 199-200.  Moreover, as shown, Tribeca's legal argument as to the ownership of the proceeds is incorrect, id., as is its further assertion, TBR 7, that Defendant violated N.Y. Penal Law § 185.10.  See R. 201-02.

Finally, Tribeca's assertion, TBR 7, 9, 11, that rather than completing the sale of his residence and then filing for bankruptcy, Defendant should first have filed for bankruptcy and then sold the residence, thereby assuring that his nondischargeable priority tax creditors could be paid, is without support and undercuts Tribeca's other arguments.[**]  Tribeca's basic posture on the motions below and upon this appeal was and is that it agreed to settle its Dismissal/Equitable Lien Motions for a nominal sum and did not object to the payment of the nodischargeable priority tax claims, in reliance upon Defendant's stated intention (later retracted) not to contest dischargeability, thereby

---

[*] Tribeca's characterization of the payments made by Defendant at TBR 6 fn. 3 is inaccurate and includes double counting.

[**] Tribeca's current argument is diametrically the opposite of the bankruptcy court's equally flawed observation that Defendant should have sold the residence, paid Tribeca and then waited for the 90-day preference period to expire prior to filing for bankruptcy in order to make such payment unassailable by the Trustee for Defendant's creditors.  See R. 23, DBR 38-39.

losing its admittedly slim chance to prevent or delay such payments in the hope of getting the bankruptcy case dismissed. Had Defendant followed Tribeca's newly minted suggestion, the priority tax creditors still would have been paid ahead of Tribeca. Moreover, it is uncertain whether the purchaser would have completed the sale in the face of the delay and uncertainty of the bankruptcy case, especially in light of the rapidly falling market.

Events preceding defendant's August 4, 2008
determination not to continue the litigation

As summarized in Defendant's Brief at 11-12, 40-44, subsequent to the determination of Defendant's motion to dismiss the Complaint, the parties sought a global resolution of this nondischargeability proceeding and, along with the Trustee, of the Case Dismissal/Equitable Lien Motions. From Defendant's perspective, an essential element of any such settlement was a substantial discount from the amount of the judgment of Tribeca's claim. Id. While the parties' versions of the settlement talks may differ, one thing is clear and admitted by Tribeca — that one of the elements of the proposed settlement was a nondischargeable debt "in the amount to be agreed upon." TBR 9. In addition, the existence of those discussions was the basis for a litigation freeze in the interim, including any requirement that Defendant answer the Complaint. DBR 11, 41 fn.*

These events make clear the falsity of Tribeca's statements in its "Counterstatement of the Case," that "on March 28, 2008 Robins advised Tribeca that he would wilfully, intentionally default," that such "fact is not controverted by Robins" and that "Robins' intent to default was unambiguously communicated to Tribeca's attorney six and one-half months before Robins changed his mind." TBR 2. This conclusion is reinforced by the undisputed facts that settlement efforts, no matter which side's version of their contents (see R. 553 "Perhaps Robins' counsel and I

---

* In view of the possibility of settlement, Tribeca's contention (TBR 11) that Defendant concluded in March 2008, rather than August 2008, that he could not afford to pursue the litigations, is irrelevant.

came out of the March 28, 2008 meeting with wholly different understandings"), continued through the end of July, 2008 and that Tribeca did not seek to have the clerk enter a default pursuant to Fed. R. Civ. P. 55(b)(1) until after the August 4 letter from Defendant's attorney advising of Defendant's inability to continue the litigation.

Tribeca recites its "strategy" at TBR 8. The goal of such strategy was to force the bankrupt Defendant to expend his scant resources to defend three litigations, two of which, the Case Dismissal and Equitable Lien Motions, Tribeca admittedly knew had little or no chance of success. However, it has now became clear that, if Tribeca's claims that it was "due to a mistake by the abstract company or its agent" that the mortgages were not recorded, TBR 6 fn. 2, and that "Tribeca is not driving this particular bus, there is an insurance company behind them. . . ." R. 244, are to be believed, then the "strategy" belongs to one of the insurers, not Tribeca itself.

Tribeca's self-serving description of what it believes to be Defendant's "strategy" and "motivating factors," TBR 9-11, is both inaccurate and irrelevant. There is nothing in the record other than Tribeca's counsel's ipse dixit, to indicate what motivated Defendant or that there was a plan or "strategy" as to how to proceed, other than that Defendant, like most bankrupts, filed for bankruptcy because he could not pay his debts and sought a fresh start by obtaining a discharge from his dischargeable debts. Of course, to obtain that discharge, he had to stay in bankruptcy, but as admitted by Tribeca, there was little chance of the bankruptcy case being dismissed, especially since the Trustee for all the creditors opposed dismissal and was holding at least $1.4 million with the prospect of obtaining more through the pursuit of claims on behalf of the bankrupt estate. R. 531.

The prospective failure of Tribeca (or the insurance company) to get paid ahead of the nondischargeable priority tax claims did not arise because of any wrongdoing on the part of Defendant or the exercise of his right to become a bankrupt. Rather, his assets, including the residence proceeds, were to be paid out to creditors in accordance with the provisions and priorities of the Bankruptcy Code. The failure of Tribeca to be paid and the loss to the insurance company is

solely attributable to the failure of someone on Tribeca's side — whether it be Tribeca, the abstract company or its agent — to record the mortgage. Had the mortgage been recorded, Tribeca, as a secured creditor, would have been paid first and there would have been no need for Tribeca's or the insurer's "strategy."

The events subsequent to the August 4 letter

The phone call, followed by the letter, on August 4, 2008 from Defendant's attorney was the first and only time Defendant unconditionally stated that he would not contest nondischargeability. DBR 13. This occurred after Defendant concluded that Tribeca had not been bargaining in good faith, as evidenced by Tribeca's settlement proposal that provided, not for a substantial discount from the amount demanded in the Complaint, but rather, for an increase from such amount. DBR 12. As further shown, subsequent thereto, the Trustee, on August 5, 2008, also objected to Tribeca's proposed stipulation. Id. 12 fn. Tribeca, however, seeks to give the false impression that the Trustee's objections came before the August 4 letter and were "easily resolved," with such resolution having been based upon the August 4 letter. TBR 12.

More significantly misleading is Tribeca's version of the events relating to Defendant's notice on September 9 that he intended to seek to oppose dischargeability and of the Court hearing on September 10, recounted at DBR 13-16. Tribeca argues that notwithstanding that it was given oral and written notice on September 9 and again before the bankruptcy court on September 10 that Defendant would seek to litigate the merits, the fact that Defendant did not make a formal motion on September 10 to vacate the default that Tribeca had the Clerk enter pursuant to Fed. R. Civ. P. 55(b)(1) precluded Defendant from successfully opposing Tribeca's subsequent motion for a default judgment and established that Tribeca relied on the default in going ahead with its then not-yet finalized settlement with the Trustee to drop the Case Dismissal/Equitable Lien Motions. See TBR 12-15, 33, 37.

To support this argument, Tribeca, after noting that the bankruptcy court had directed it to submit a motion for a default judgment, then quotes Defendant's attorney as follows "I

will be . . . making a motion to vacate the default."  However, if the words deleted by Tribeca are supplied, what Defendant's attorney said to the bankruptcy court was as follows:  "I have no fault with the time line you have now set for the motion [for a default judgment], but I will be — either in response to his default motion or as a cross motion, making a motion to vacate the default. R. 574 (emphasis supplied).  As can be seen, what Tribeca omitted in its quotation was Defendant's counsel's advising the bankruptcy court that he would seek to have the default vacated, either in his opposition papers to the default judgment motion or by a cross motion.  And, what in fact occurred was that Defendant did both, since he opposed the motion for a default judgment within the fixed schedule and in those papers formally asked for the incidental relief of vacating the default.*  See R. 121-22, 191, 209.  What Tribeca crudely attempts to do by its misleading quotation is to obscure the unassailable fact that it was fully aware that it could not rely on Defendant's earlier default until it successfully obtained a default judgment and that if it thought that its Case Dismissal/Equitable Lien Motions had any real value, it acted at its peril in proceeding with its then not-yet finalized or approved settlement with the Trustee and in not objecting to the Interim Distributions.  See DBR 15-16, 40-43.

       In light of the foregoing and the demonstration in Defendant's Main Brief with respect to the events starting with September 9, DBR 13-16, 41-43, the "bullet" points at TBR 13-14 are immaterial and/or irrelevant.  With respect to those not discussed above, although the formal deadline for submitting written objections to the Interim Distribution Motion may have passed on September 5, 2008, Tribeca's counsel was asked by the bankruptcy court at the September 10 hearing whether Tribeca had any objection, to which he responded in the negative, when Tribeca was fully aware that the issue of vacatur of Defendant's default was going to be litigated.  Thus,

_____

\* As shown in Defendant's Brief, the standards for vacating, under Rule 55(c), a default entered by the clerk, and for entry or denial of a motion for a default judgment under Rule 55(b)(2), are the same.  DBR 22-23.  Denial of the motion for default judgment would necessarily involve vacatur of the entry of default.  It would have served no purpose to serve a separate piece of paper labeled "motion" to obtain that relief.

there was nothing to prevent Tribeca from objecting or seeking to delay the distribution at that time until after the default/nondischargeability litigation was resolved, based upon the changed circumstances. See DBR 14-16, 41-43. And, while it might be true that Tribeca and the Trustee had agreed in principle upon a settlement by September 10, the bankruptcy court was informed that some details still needed to be worked out, the settlement stipulation was not fully signed by both sides until at least September 11 and the requisite approval was not sought or obtained until well into October. See DBR 15-16. Thus, Tribeca had ample and repeated opportunities either to not finalize or to withdraw from the settlement based upon the changed circumstances.

Tribeca's last bullet point is its most telling, since it admits that even though it was fully aware that litigation would be required before it could obtain any judgment declaring Defendant's debt to be nondischargeable, either by way of default judgment or after trial on the merits, Tribeca "was unwilling to unwind the settlement with the Trustee when there was nothing before the Court." TBR 14. As shown above, there was something before the bankruptcy court and Tribeca knew it would have to litigate before obtaining any judgment. And, there was nothing to "unwind," since the settlement had not been finalized. That Tribeca was "unwilling" to withdraw from the proposed settlement, notwithstanding the overhang of such litigation, establishes that it proceeded with its eyes wide open and did not rely on the earlier default and Defendant's since-retracted August 4 statement of intention not to litigate nondischargeability.

Similarly, Tribeca's discussion of the "timetable" at TBR 14-15 is of no support to it. Defendant's papers in opposition to Tribeca's default judgment motion were served on October 10, three days before they were due. Tribeca knew that Defendant would be opposing the motion and clearly expected them. As discussed above, the opposition papers served the same purpose as a motion to vacate and, in fact, such incidental relief was requested therein. In sum, the timetable or time line of events cannot serve as the basis for an argument that Tribeca reasonably relied upon the default or retracted statement of intention not to contest dischargeability, since it was fully aware, starting on September 9, that Defendant would be attempting to avoid his earlier default and seek to litigate the merits of Tribeca's nondischargeability claims. And, the sequence of events discussed at

DBR 13-16, 41-43 and above, also refutes Tribeca's unsupported charge that "Robins failed to play by the procedural rules and effectively sandbagged Tribeca." <u>See</u> TBR 15.

Finally, Tribeca's discussion of the nuances of its "strategy," TBR 15-17, makes interesting reading, but is not relevant to the issues on this appeal. As best can be discerned, Tribeca claims that if Defendant had not at some point consented to nondischargeability, Tribeca would have then saved money by pursuing both dismissal of the bankruptcy case and nondischargeability on a consolidated basis. However, this begs the question of whether Tribeca reasonably relied to its detriment on Defendant's retracted consent to nondischargeability and the ensuing default, since as shown, Tribeca knew before the settlement with the Trustee was complete that Defendant would be seeking to contest nondischargeability. And, there is no reason to believe that the "admittedly difficult issue" of whether the bankruptcy court would dismiss the case, TBR 17, was any more likely to have been decided in Tribeca's favor had Defendant not initially consented to nondischargeability.

<u>**ARGUMENT**</u>

**I.    LEGAL STANDARDS APPLICABLE TO THIS APPEAL<br>AND THE MOTIONS BEFORE THE BANKRUPTCY COURT.**

In Section I of Defendant's Brief at 21-23, Defendant set forth the standards employed by the courts in the Second Circuit to determine the types of motions before the bankruptcy court that are the subject matter of this appeal. Tribeca does not dispute this showing, but endeavors to create an additional requirement — that in order to successfully oppose a motion for a default judgment under Fed. R. Civ. P. 55(b)(2), a defaulting party must first make a formal motion to vacate the default under Fed. R. Civ. P. 55(c). <u>See</u> TBR 17-18. There is no such requirement, the bankruptcy court's decision did not allude to any such requirement and Tribeca's illogical reasoning fails to provide any basis therefor.

While the structure of the various Rules allows a defaulting party to move under Rule 55(c) to vacate a default before the other party moves for a default judgment under Rule 55(b), nothing in the Rules requires such a motion to vacate where, as here, the other party has already

-11-

moved for a default judgment.  Such a motion would be an unnecessary formality.  In addition, Defendant did formally seek such relief in its opposition papers by explicitly asking for such vacatur as lesser included incidental relief.

Tribeca attempts to establish its dubious proposition by first asserting that "[t]he standard for setting aside a default under Fed. R. Civ. P. 55(c) is essentially the same as the standard for vacating a default judgment under Fed. R. Civ. P. 60(b)." TBR 17.  However, the very case quotation it uses to validate its assertion says just the opposite, to wit, that although the <u>factors</u> to be applied under either rule are essentially the same, "[i]t is well established that the <u>standard</u> for setting aside a default pursuant to Rule 55(c) <u>is less rigorous</u> than the 'excusable neglect' standard for setting aside a default judgment pursuant to Rule 60(b)." <u>Richardson Greenshields Securities, Inc.</u> v. <u>Int'l Petroleum Corp.</u>, 1988 U.S. Dist. Lexis 20974 at *5-6 (S.D.N.Y. 1988) (emphasis added).  <u>See also</u> <u>Dow Chemical Pacific Ltd.</u> v. <u>Rascator Maritime S.A.</u>, 782 F.2d 329, 335 (2d Cir. 1986).  To this fallacious assertion, Tribeca quotes from Rules 55(c) and 60(b), which refer to a motion under those rules and from excerpts from cases dealing with motions thereunder.  TBR 17-18.  From this, Tribeca makes a quantum leap to conclude, without more, that Defendant was required, but failed, to make a formal motion pursuant to Rule 55(c) in order to successfully oppose Tribeca's motion for a default judgment under Rule 55(b).  This makes no sense, either in law or logic.

In any event, as shown above, Defendant did all he was required to do under the procedure and schedule set up by the bankruptcy court and agreed to by the parties at the September 10 hearing.  Tribeca was directed to make a Rule 55(b) motion for a default judgment, Defendant served papers opposing such motion three days before the time they were due and within such papers asked for the lesser included incidental relief of having the default entered by the clerk vacated.  <u>See</u> R. 121-22, 191, 209; DBR 16.  Nothing more was required or necessary.  Tribeca's argument does not even rise to the dignity of a technicality.

II.    **THE BANKRUPTCY COURT APPLIED AN ERRONEOUS LEGAL STANDARD WITH RESPECT TO DEFENDANT'S ATTEMPT TO VACATE THE DEFAULT AND MADE CLEARLY ERRONEOUS FACTUAL DETERMINATIONS IN CONCLUDING THAT SUCH DEFAULT WAS WILLFUL AND STRATEGIC.**

Defendant's Brief demonstrated that the bankruptcy court erred in (a) concluding that Defendant's default was willful and strategic; and (b) holding that such "willful" default was in and of itself a sufficient basis for refusing to vacate the default and granting a default judgment, without regard to application of the other applicable factors, such as the merits of Defendant's defenses and whether Tribeca would be prejudiced by having to try the case on the merits. See DBR 25-29. These errors in and of themselves constituted abuses of the bankruptcy court's discretion. Among other things, Defendant showed that the bankruptcy court failed to give sufficient consideration to the uncontested showing that far from being "strategic," the only reason for the default was Defendant's inability to afford the anticipated defense expenses of more that $100,000, which conditions changed when he was offered free legal assistance within less than one month after entry of the default by the Clerk. Id.

Notwithstanding Tribeca's selected quotations from the bankruptcy court's initial remarks at the outset of oral argument in Tribeca's default judgment motion,* Tribeca has not met Defendant's showing that the default was not and could not be called "strategic." Instead, Tribeca merely cites cases that show that willfulness is an important factor, but does not distinguish the authorities cited by Defendant that show that willfulness of the default in and of itself will not always preclude vacatur of a default or denial of a default judgment, but rather, that the circumstances of the default must be examined, as well as the other factors or meritorious defenses and lack of prejudice to the party seeking to enforce the default.

---

* Defendant notes that the bankruptcy court backtracked from its initial remarks, R. 235-36, and after hearing oral argument, initially denied Tribeca's motion, concluding that notwithstanding his misgivings and the default, Defendant should be given a chance to defend this adversary proceeding on the merits. R. 249. This Court is respectfully referred to the transcript of the entire hearing. R. 231-54.

Defendant has already distinguished certain of the cases cited by Tribeca, since these were relied upon in the bankruptcy court's opinion.[*]  The balance of the cases cited does not undercut Defendant's showing.  In Brien v. Kullman Indus., Inc., 71 F.3d 1073 (2d Cir. 1995), the Court reversed the denial of a motion to vacate a default judgment, after it had determined that the defendant had shown the existence of a meritorious defense and plaintiff had not shown that it would be prejudiced by vacatur.  After examining all of the circumstances surrounding the default, the Court determined that it was not willful.  While the Court reiterated the quote from Marc Rich that "[a] default should not be set aside when it is found to be willful," it did not state that a willful default may never be vacated if the circumstances surrounding the default and the other factors warrant such vacatur, as was done in Wagstaff-El v. Carlton Press Co., 913 F.2d 56, 57 (2d Cir. 1990) and the cases discussed at DBR 28-29.

In re Men's Sportswear, Inc., 834 F.2d 1134 (2d Cir. 1987) looked to all three factors, not just willfulness and found that "even under the more lenient standards of Rule 55(c), the imposition of default judgment against [defendant] was justified."  As to willfulness, the Court found that both in the litigation before it and in a related litigation, defendant had "engineered the obstructionist tactics that hindered both actions" and that defendant's conduct in ignoring a court order to respond to an amended complaint was part of such tactics.  See 834 F.2d at 1136-37, 1139.

American Alliance Ins. Co. v. Eagle Ins. Co., 92 F.3d 57 (2d Cir. 1996) reversed the denial of a motion pursuant to Rule 60(b) to vacate a default judgment, holding that the negligence of counsel did not amount to willfulness, reserving that label for egregious or deliberate conduct. Id. at 61.  Contrary to the decision of the bankruptcy court here and Tribeca's position, the

---

[*] See discussion at DBR 26-27 of Action S.A. v. Marc Rich & Co., 951 F.2d 504 (2d Cir. 1991); Hernandez v. La Cazuela de Mari Rest., Inc., 538 F. Supp. 2d 528 (E.D.N.Y. 2007) and Gaglio v. Silverman, 330 B.R. 40 (Bankr. S.D.N.Y. 2005).

<u>American Alliance</u> cases recognized the need to consider all three factors, including the circumstances resulting in even a "willful" default.  <u>Id</u>.\*

Finally, in <u>Heymann</u> v. <u>Brechner</u>, 1996 U.S. Dist. LEXIS 14936 (S.D.N.Y. 1996), also a Rule 60(b) case, the Court did consider all these factors, but held that the defendants' showing on each of the prejudice and meritorious defense factors were not strong enough to overcome the finding of willfulness, where defendant, after missing various litigation deadlines, failed to timely respond to a court-ordered motion for a default judgment and then moved to vacate the judgment some five months later while the judgment was in the process of being enforced.  In contrast, Defendant submits that here he has made more than a sufficiently strong showing of the existence of meritorious defenses and lack of prejudice to Tribeca to overcome any negative weight that could be given to the "willfulness" of his short-lived default, caused solely by his inability to afford the costs of litigation.\*\*

## III.    THE BANKRUPTCY COURT ERRED IN CONCLUDING THAT DEFENDANT DID NOT SHOW MERITORIOUS DEFENSES.

In Defendant's Brief, section IV, Defendant demonstrated that not only had he easily met the required showing of the existence of meritorious defenses to Tribeca's claims, but that the bankruptcy court erroneously failed to apply the appropriate tests by failing to construe the exceptions to dischargeability narrowly in favor of Defendant and failing to construe the proposed defenses asserted by Defendant generously in his favor.  Defendant also showed that the bankruptcy

---

\* <u>United States</u> v. <u>Erdoss</u>, 440 F.2d 1221 (2d Cir. 1971) does not deal with the issue of willfulness as affecting or precluding the application of the other parts of the three part test.  Rather, it was a pre-<u>Wagstaff</u> Rule 60(b) motion to vacate a default judgment under either subsection (b)(1) "excusable neglect" or the catch-all provisions of subsection (b)(6).  The Court held that defendant's failure to object to the entry of a default judgment by reason of counsel's mistaken belief as to its legal effect was not "excusable neglect" under (b)(1) and that as a matter of law, failure to qualify under (b)(1) precluded qualification under (b)(6).

\*\* The <u>Heymann</u> court also applied the wrong standard with respect to the meritorious defense factor, by requiring defendant to show that plaintiff's claims were "facially frivolous."  1996 U.S. Dist. LEXIS at \*17.

court applied an incorrect standard by requiring, at the motion stage, that the proposed defenses be shown to be ultimately persuasive, as opposed to merely presenting evidence of facts that, if proven at trial, would constitute a complete defense.  See DBR 29-30.  Defendant also showed that these errors were amplified by the bankruptcy court's erroneous conclusion that its determination of willfulness with respect to Defendant's default was dispositive, resulting in its failure to give sufficient consideration to Defendant's showing of meritorious defenses and lack of prejudice to Tribeca.

Tribeca either does not dispute and/or "concedes," the legal standards set forth by Defendant, but claims that Defendant has not met them.  TBR 21.  Tribeca is wrong.

**A.**     **Section 523(a)(2)(B)**

Defendant's Brief established that not only could he meet the "low threshold" standard for establishing a meritorious defense to this claim, but also that Tribeca will not be able to establish any, much less all, of the elements of this claim.  See DBR 5-7, 31-34.  As shown therein: (a) Defendant did not obtain the loans by the use of the written applications claimed by Tribeca, thereby precluding Tribeca's establishing that the debt was created through the use of writing with respect to Defendant's financial condition, as required by clauses (i) and (ii) of subsection (B) of section 523(a)(2) of the Bankruptcy Code; (b) Tribeca cannot satisfy its burden of establishing the dual requirements of clause (iii) of reasonable reliance on the alleged false statements; and (c) that the allegedly false written financial statement was made with intent to deceive, as required by clause (iv) of section 523(a)(2)(B).

Much of Tribeca's response has already been discussed above in the "Statement of Facts" section of this memorandum and will not be repeated here.  This includes Tribeca's main contention, to the effect that, notwithstanding the communications between Tribeca's agent and Defendant with respect to the existence of Defendant's contingent liabilities arising out of his restaurant business, Tribeca's instructions that checking the applicable boxes in revised application forms that Tribeca had prepared would suffice and that for purposes of the applications, only

liabilities shown on Defendant's credit report need be shown, Defendant's omission of a schedule

showing such contingent liabilities in amount and detail created a ground for nondischarge under

section 523(a)(2)(B).

In its desperation, Tribeca, without any citation to authority, argues that its employee

Carayol's knowledge of the supposed fraudulent loan applications should not be attributed to

Tribeca by reason of the "adverse interest exception." TBR 25. However, Tribeca cannot

successfully seek refuge in the adverse interest exception to the "fundamental principle of agency

that the misconduct of managers within the scope of their employment will normally be imputed to

the corporation." See In re CBI Holding Co., Inc., 529 F.3d 432, 448 (2d Cir. 2008).

In order for Carayol's knowledge not to be attributed to Tribeca, it would be required

to show that Carayol had totally abandoned Tribeca's interests and was "acting totally for [his] own

interest and not that of the corporation." Id. at 449. But there is no such evidence. It was both in

Tribeca's and Carayol's interest to make the loans to Defendant and reap the healthy commissions

and fees associated therewith, regardless of the non-existence of any other assets belonging to

Defendant or whether in fact his actual income justified the Loans. Carayol's interests were co-

extensive with, and not contrary to, Tribeca's. All Tribeca was concerned about was the value of

the mortgaged house, which it would have recovered had it not neglected to record the mortgage.

Any loss it may have suffered did not arise from conduct inconsistent with Tribeca's interests. [*]

**B.    Section 523(a)(4)**

The bankruptcy court gave short shrift to Tribeca's claim under section 523(a)(4), by

calling it "problematic," and Tribeca ultimately agrees at TBR 30 ("while the claim under

---

[*] The quotation at page 25 of Tribeca's Brief does not support its position. Indeed, it shows
Tribeca's anxiousness to make the loans, regardless of Defendant's lack of assets and his credit
score and that Defendant was trying to bargain for the most advantageous terms. It does not even
remotely tend to prove Tribeca's contention that Defendant is not an "honest debtor" entitled to a
discharge from the Tribeca debt.

§523(a)(4) — embezzlement may be problematic").  Nevertheless, Tribeca devotes over four pages of its brief attempting to show that Defendant's failure to turn over the residence sale proceeds to it came within that section, on the premise that such conduct "is a significant part" of its claim under section 523(a)(6).  See TBR 26-30.  That claim is discussed in the next section of this brief.  With respect to the section 523(a)(4) claim, this Court is once again referred to pp. 9 through 14 of Defendant's memorandum of law before the bankruptcy court, R. 198-203, for the reasons why Tribeca's section 523(a)(4) is without merit.

In addition, New York Real Property Law § 291, TRB 26, does not help Tribeca, since it merely provides that an unrecorded mortgage is void against a bona fide purchaser for value or subsequent mortgage whose conveyance or mortgage is first duly recorded.  Under the "strong arm" provisions of section 544(a) of the Bankruptcy Code, a trustee in bankruptcy is given the status of such a purchaser or mortgagee.  See 5 Collier on Bankruptcy ¶ 544.02 (15th ed. rev. 2009).  And, even if prior to bankruptcy Tribeca's unrecorded mortgage was a lien as between Tribeca and Defendant, a lien does not establish ownership in the property or the proceeds of sale, which remain the property of the mortgagor.  Thus, there can be no claim for embezzlement because, among other things, an owner cannot embezzle from himself.  TBR 29.*

C.    Section 523(a)(6)

Defendant's Brief demonstrated that if the bankruptcy court's discussion of the substance of Tribeca's section 523(a)(6) claim could be construed as a determination that Defendant had not shown a meritorious defense thereto, it applied an improper "likelihood of success" standard and that the record showed that, under applicable law, Tribeca would not be able to establish the elements of this claim.  Thus, Defendant established that the proceeds of sale were

_____

* While many of the allegations of the Complaint which Tribeca purports to summarize at TBR 29 are disputed, by its own admission Tribeca was notified by Defendant of the pending sale of the residence and received a copy of the contract of sale in advance of the closing.  See TBR 6; DBR 7-8.  Thus, its allegation that Defendant sold the residence without Tribeca's prior written consent, TBR 29, is meaningless.

never Tribeca's property, that his conduct as to the proceeds was without intention to injure Tribeca and that, in any event, Tribeca did not suffer any injury through Defendant's conduct, since it admittedly would not have been allowed to keep the proceeds in Defendant's bankruptcy case. DBR 36-39.

Tribeca's Brief does not meet Defendant's showing that Tribeca lacked ownership of the proceeds or that had Defendant paid Tribeca, the Trustee would have recovered such payment as a voidable preference. Instead, Tribeca focuses on only one of the elements of a section 523(a)(6) claim and argues that Defendant's failure to turn over some $187,000 of the $1,739,500 gross proceeds of the sale to the Trustee evidenced an intent to harm Tribeca, thereby establishing the "willful and malicious" element of section 523(a)(6). See TBR 30-33. This argument falls on its face since, as shown, the proceeds were not Tribeca's property and Tribeca would not have been entitled to retain any payment made to it.[*] Thus, Tribeca has made no showing that it could establish the requisite section 523(a)(6) elements.

Finally, the cases cited by Tribeca TBR 31-32 do not help it. Tribeca's reliance upon Navistar Financial Corp. v. Stelluti, 94 F.3d 84 (2d Cir. 1996) is misplaced. The property and proceeds in Navistar were by contract explicitly denominated as the property of the creditor and the defendants' wholly owned corporation was under a contractual duty to hold any sale proceeds in trust for, and immediately forward them to, the creditor. 94 F.3d at 85. In addition, notwithstanding the claimed belief of one of the defendants that the proceeds did not belong to the creditor, her conduct in transferring them to out of state bank accounts was held to be "malicious" under section 523(a)(6), since there was no legitimate purpose for defendants' conduct other than to harm the property interest of the creditor. By contrast, in the present case, the lack of an ownership interest in Defendant's residence or the proceeds of its sale in itself is fatal to Tribeca's claim.

---

[*] In fact, only about 11% of the $1.79 million gross proceeds was not ultimately turned over for disposition by the Trustee. And, Tribeca's characterization of the payments made by Defendant is inaccurate and includes double counting.

Additionally, the placing of the proceeds in escrow for turnover to the Trustee, rather than Tribeca, served the legitimate purpose of insuring that their payment would be made in accordance with the priorities of the Bankruptcy Code.[*]

**IV.    THE BANKRUPTCY COURT ERRED IN CONCLUDING THAT TRIBECA WOULD BE PREJUDICED BY DENIAL OF A DEFAULT JUDGMENT AND VACATUR OF THE DEFAULT AND THAT DEFENDANT HAD IRREVOCABLY WAIVED AND WAS EQUITABLY ESTOPPED FROM LITIGATING THE MERITS OF THE NON-DISCHARGEABILITY PROCEEDING.**

Defendant's Brief set forth in detail why the bankruptcy court was wrong to conclude that Tribeca would be prejudiced by allowing Defendant to continue to contest nondischargeability on the merits and to use Tribeca's claimed reliance upon Defendant's retracted and short-lived intention not to contest nondischargeability as the basis for its additional determination that Defendant had waived and/or was equitably estopped to continue this litigation. See DBR 39-46. Tribeca's Brief fails to meet this showing and also makes additional arguments which strengthen Defendant's showing that Tribeca will not be prejudiced.

Thus, the timeline of the events surrounding the default, its retraction and Tribeca's conduct showed that Tribeca was fully aware of Defendant's change of intention and had ample opportunity to refrain from taking the steps it and the bankruptcy court pointed to as establishing reliance — dropping its Case Dismissal/Equitable Lien Motions for a nominal amount paid by the Trustee and not objecting to the Interim Distributions. Tribeca now admits what Defendant has

---

[*] The other case cited by Tribeca, Citik Ka Wah Bank Ltd. v. Wong, 291 BR. 266 (Bankr. S.D.N.Y. 2003) is the same as In re Wong, cited by Defendant at DBR 36-37 for the same purpose as setting forth the elements of a section 523(a)(6) claim. As noted by Tribeca, Wong follows Navistar, which is distinguished above. Wong was decided on a motion to dismiss the complaint and held that the complaint sufficiently pled the element of malice by alleging that the purpose of diversion of the funds claimed by the creditor bank was to prevent it from collecting them. By contrast, the Defendant's disposition of the sale proceeds (which did not belong to Tribeca) allowed Tribeca and other creditors the opportunity to obtain such funds in accordance with the scheme of the Bankruptcy Code — a legitimate purpose.

already shown: (a) that Tribeca knew of Defendant's intention to contest the merits prior to the time it finalized its settlement with the Trustee, and (b) armed with such knowledge, Tribeca was <u>unwilling</u> to withdraw from the settlement based on such changed circumstances, despite the fact that on September 10 a schedule had been set for Tribeca to make, and for Defendant to oppose by October 13, 2008, a motion for a default judgment that Tribeca had not therefore made, notwithstanding the Clerk's entry of the default on August 13. <u>See</u> discussion of events and timeline at pp. 8-11, <u>supra</u>. Simply put, Tribeca was "unwilling" to withdraw from the settlement, despite having had ample opportunity to do so.

Tribeca protests that had it sought to "unwind the settlement and consent with the Trustee" it would have amounted to "defacto and dejure dishonesty" and "contrary to all procedural rules and timetables." TBR 33. However, Tribeca fails to specify how withdrawing, due to changed circumstances going to the very reason it claims to have agreed to the settlement in the first place, prior to finalization and before seeking to obtain court approval, is not within the Rules or evidences any dishonesty.* Thus, Tribeca's assertion, TBR 34, that what Defendant "seeks to do here is to punish Tribeca for complying with the rules," is empty rhetoric. Similarly, its complaint that by September 9 "all relevant deadlines had passed," <u>id</u>., presumably referring to the time to object to the Interim Distribution Motion, is of little consequence, especially since on September 10, the bankruptcy court specifically asked Tribeca's counsel if he had any objection, to which he replied that he did not. <u>See</u> DBR 41-42; R. 566-67.

Tribeca's list of four supposed items of prejudice at TBR 34 requires little additional comment. That Tribeca "conducted no discovery" is meaningless, in view of (a) the agreed upon litigation freeze pending the unsuccessful attempt at a global settlement, (b) the fact that after the bankruptcy court initially denied Tribeca's default judgment motion, Tribeca did conduct extensive

---

* Tribeca does not attempt to contest Defendant's showing of an additional ground for lack of prejudice — that the Case Dismissal/Equitable Lien Motions admittedly had little or no chance of success. <u>See</u> DBR 46-48.

discovery (see DBR 17), and (c) Tribeca has failed to show how it suffered any injury by not having conducted discovery any sooner.

That Tribeca did not commence a separate adversary proceeding seeking to impose an equitable lien is also meaningless. Tribeca does not explain how Defendant's default caused it to make this litigation decision. Nor does it explain why bringing such motion in tandem with its case dismissal motion caused it to be injured. And, in any event, the equitable lien motion admittedly had no chance to succeed in the bankruptcy case. Indeed, as early as the March 12, 2008 hearing, it was referred to by Tribeca's counsel as merely being a placeholder that Tribeca wanted on the record, but did not wish to pursue at that time. See DBR 11.

Item numbered "3" — the alleged settlement of the "open issues" with the Trustee by "late in the day September 9" and item "4" — Tribeca's nonobjection to the Interim Distribution motion have already been discussed extensively in Defendant's Brief.*

Tribeca's only response to Defendant's showing that Defendant should not have been held to have waived his right to contest nondischargeability is to make a one sentence conclusory statement that "[i]t is factually undeniable" that Defendant "repeatedly waived" such right, citing In re Frank Santora Equipment Corp., 256 B.R. 354 (Bankr. E.D.N.Y. 2000). TBR 34. However, such assertion is deniable, both as a matter of fact and as a matter of law. See DBR 41 fn., 43-44. The Frank Santora case is of no particular support to Tribeca, since it merely recited the established elements of the waiver doctrine and held that the conduct of a bankruptcy trustee in not deposing one of the defendant's personnel did not amount to a waiver of his right to assert fraudulent conveyance claims. See id. at 371.

---

* Defendant notes that Tribeca's claim that the "open issues with the Trustee" were settled with the Trustee late in the day of September 9 — the same time Tribeca was notified of Defendant's intention to contest nondischargeability — is disingenuous, in view of the fact that the bankruptcy court was advised by counsel on September 10 that the language of the stipulation had not been worked out and that the agreement had not been finalized. See DBR 15-16.

Tribeca's reply to Defendant's showing that his conduct did not warrant the bankruptcy court's equitable estoppel conclusion is even more bereft of substance, since all Tribeca says to justify estoppel is that "[i]n reliance on the repeated waiver, Tribeca, by settling with the Trustee, waived its rights," citing In re Texaco Inc., 254 B.R. 536 (Bankr. S.D.N.Y. 2000).  TBR 34-35.  As shown in Defendant's Brief and hereinabove, both premises of this conclusory argument are incorrect.  And, the Texaco case, in which the bankruptcy court held that a plan proponent was equitably estopped from contending that claimants who had reasonably relied upon prominent misleading statements in Texaco's plan disclosure statements were nor precluded from filing claims arising under certain contracts that were neither assumed nor rejected as a result of plan confirmation, does not aid Tribeca.  Indeed, the elements of equitable estoppel recited therein, at id. at 560-61, have been shown to be absent here.  See DBR 45-48.

## V.    THE BANKRUPTCY COURT ABUSED ITS DISCRETION.

Defendant has shown that the bankruptcy court's determinations upon the orders appealed from amounted to abuses of its discretion, in that it based its rulings on erroneous views as application of the law and/or on a clearly erroneous assessment of the record.  The last subsection of Tribeca's Brief at 35-37 does not attempt to meet any of Defendant's specific showings, but instead is a conclusory selected potpourri of earlier arguments made by Tribeca, as to which Defendant has already responded.  However, certain of Tribeca's assertions deserve comment.

Tribeca claims that even though Defendant may have correctly shown that Tribeca would have faced "difficulties" in trying to dismiss the bankruptcy case and in pursuing its equitable lien claim, it nevertheless would have pursued them had Defendant not defaulted and thus, there would have been no interim distribution in September 2008, but perhaps in September 2010, "after a trial and inevitable appeals."  TBR 36-37.  This argument is noteworthy in that it confirms that Tribeca's motions to dismiss and for equitable lien admittedly had little or no merit, but were part of a cynical "strategic" attempt by Tribeca to delay and impose undue costs not only to Defendant, who could ill afford to pay them.  Unfortunately, unless this Court reverses the decision

below and allows Defendant to continue to litigate the merits, Tribeca's strategy will have succeeded.

Tribeca's rantings about Defendant having likely committed federal and state crimes, TBR 37, is without legal or factual foundation. Moreover, Tribeca can point to no criminal investigations or proceedings against Defendant, and this argument is an improper attempt to place Defendant in a negative light. And, the bankruptcy court has not made an informed determination as to Defendant's credibility. There has been no trial testimony in this matter and Tribeca's "proof" is essentially limited to the declarations of its attorney. TBR 37.

Defendant also has not, as charged by Tribeca, TBR 37, "criticized Tribeca for adhering to the procedural rules and timetables," nor were Defendant's "actions . . . designed to constantly sandbag Tribeca and cause it to allow procedural deadlines to pass." Id. There is no support in the record for such claims. Certainly, not the repeated quotation from Tribeca's agent about "changing the rules," which had nothing to do with procedural deadlines and related only to Carayol's perception of Defendant's negotiating positions.

In sum, Tribeca has failed to effectively rebut Defendant's demonstration that the bankruptcy court abused its discretion, requiring reversal of its decision and allowing Defendant the opportunity to continue this litigation on its merits.

## <u>CONCLUSION</u>

The decision and orders of the bankruptcy court appealed from must be reversed and vacated and the matter remanded to the bankruptcy court for continuation of discovery and trial on the merits.

Dated:  July 8, 2009

Respectfully submitted,

/s/_____

THEODORE GEWERTZ (TG 2428)
51 West 52nd Street
New York, New York  10019
(212) 403-1000
E-mail tgewertz@wlrk.com
*Special Litigation Counsel pro bono*

ALTER, GOLDMAN & BRESCIA, LLP
Bruce R. Alter (0457)
550 Mamaroneck Avenue
Harrison, New York  10528
(914) 670-0030
E-mail altergold@aol.com

*Co-Attorneys for Defendant/Appellant
Stephen M. Robins*